Good morning, Your Honors. May it please the Court, Michael Traynor and Lori Plager of the Cooley Godward Kroenig Firm and Douglas Hauser of the Boulevant Hauser-Bailey Group, a repellent TIG insurance company. Your Honors, we'd like to reserve five minutes, please, for rebuttal. The judgment of the District Court should be reversed. Most fundamentally, the District Court erroneously failed to apply a plain and unambiguous insurance policy term. The loss at issue here was caused by earth movement, and TIG's policy excluded loss for any earth movement. That provision is not ambiguous. Indeed, the District Court nowhere suggested that it was ambiguous. When you joined with Federated in your original presentations, you simply relied on what was in the Federated policy. Is that accurate? It's not accurate, Your Honor. The two companies were jointly represented by the Boulevant Hauser firm, and they took common positions, for example, on the collapse exception that the Federated policy. But from the beginning, in TIG's motion for summary judgment, which laid out the background of the insurance here, it emphasized that it had a different and separate exclusion. It might have been more strongly stated in the original motion for summary judgment, but it was stated throughout. And moreover, and quite importantly, in the address this issue as one of law. He didn't make a point out of whether it had been raised properly before or whether, and he rejected the idea that there had been a waiver or estoppel. He conscientiously hit, and he said, page 119 of the record, he said he wanted to hit this legal issue foursquare. And he did so, but we think we got it wrong, and that's why we're here in asking this Court to reverse with directions to enter judgment for TIG Insurance Company. Mr. Schroeder, let me, something I'm trying to understand here, maybe it's because I'm just not all that familiar with Washington law on insurance coverage issues, but the district court judge, when I read his oral decision in the colloquy, that hearing that you were just talking about, he makes light of the note that the Washington law is very You had the federated policy and its coverage and its exclusions. And then we had the excess coverage, TIG, which was a follow through or follow on, follow forward policy, which it basically incorporated the TIG, the federated policy provisions. Correct? Your Honor, we don't say it incorporates. It follows form subject to exception. What happens to all the policy provisions in the federated? So let me back up a minute. So the insured is seeking coverage for certain, against certain losses. And when you look at the federated policy, just looking at it, when I looked at it for the very first time, and you see the one exception in the main part of the policy where it excludes sinkhole, collapse caused by sinkhole or whatever that might be. Other than sinkhole collapse, right. And then you see the rider that's attached to it that says any earth movement is excluded. When you look at that, I think it's ambiguous. Just let me speak for myself. I mean, I look at that, it looks like it's ambiguous. Okay. So it's probably coverage under federated. And I think that's what the district court said. And you didn't, nobody appealed that, I guess. I'm sorry? No one appealed the fact that federated was on the hook. Is that right? No, that, after the ruling against federated, federated settled for the policy limit stated in a policy of 25 million. So now here's this insured thinking that they've got this loss coverage. And they get this excess policy. And lo and behold, they learn that this particular loss is not covered within the excess policy. But yet it's a follow-on policy. So I, you know, I don't quite understand how do you look at these policies under Washington law? How you should look at them? Let me take first the judge's comments. I said he was conscientious, but we also think he was gratuitous about his experience under Washington law, because we've cited a number of Washington cases which hold, uphold insurance exclusions for the carrier. It's not as if Washington State is sort of a gift shop for insured claimants. It's not. In fact, they've rejected the so-called reasonable expectation of the insured doctrine. But going to your point about how you interpret these policies, we made it very clear in the three-page excess of indemnity portion of the policy that that policy trumps. Then it brings into paragraph seven of that policy the general terms and conditions. So in terms of priorities of interpretation here, you would start with the excess indemnity policy, the three-page policy that has a clear and unambiguous exclusion for any earth movement. And then second, any, you'd go to the terms and conditions, which are really not materially an issue here, and then to the federated policy. And the key language in the TIG policy is except is provided elsewhere in this agreement. And then you turn to the unambiguous term, which is pointed out in a bold cap, underlined exclusion marks, special exclusion. And you go to that, and it says any earth movement. But going to what may be at the heart of your question, your argument. It lists a whole bunch of things, but it doesn't list, and then it says any earth movement, but it doesn't list sinkhole collapse. No, it doesn't. And the PUD has tried to make a point out of, well, we could have easily put in sinkhole collapse. And let me respond to that particular part of the argument. With the benefit of hindsight, it's always easily possible to insert some term. It's a make-weight argument in our view. Nothing in the law requires an excess carrier to denote, it said, earthquakes, volcanic eruption. Any earth movement, it's a general clause. And you're asking, it's not easy for a draftsperson to think of all the possible contingencies. There could have been dozens of types of earth movement here that might have been included. So we're asking with the benefit of hindsight. And the law doesn't really do that. It doesn't do that in insurance cases or contract cases or statutes or wills or, for example, product liability warnings. But the business background here, Your Honor, and I want to take Your Honor's question about the expectations of the insured and the point that's been made by PUD about the commercial background being important. And let me just invite your attention. It was raised actually in the original motion papers that Judge Fletcher has referred to. But here, there was not just a fire insurance policy and an excess policy. There was catastrophe coverage. It was $70 million of catastrophe coverage provided by the London insurance companies, for which they paid a combined premium of about $705,000. The premium for the underlying federated policy was some $137,000. And the premium for the TIG policy was $50,000. And the expectation, if there was an expectation here, is dramatically brought out by a document in the record. It's at page 0445. It's at tab 30 in volume 3. And it's a letter from the broker for PUD to the general manager of PUD. And it's May 23, and it's about a month after the dam collapsed. Within weeks. And he explains they're talking about renewal coverage here. And he explains that the property insurance, the type represented by the TIG policy and by federated, covers common property insurance perils. That is fire, lightning, wind, vandalism, theft, vehicle damage. And then the critical phrase in that letter, it does not cover the catastrophe perils such as flood, earth movement, and collapse, which are covered under the London policies. So there's a clear indication of the understanding here in the letter from the broker to the insurer that catastrophes such as dam collapses and earth movement, floods, are covered under the Lloyd's policy, and you don't look to the property insurance. Now, this is post hoc rationalization. Is there any letter explaining things to the PUD prior to the accident? There's no. We needed no letter because it was clear. There is no letter. There is no letter as you describe it. But there is a policy which says. I understand. The accept is provided elsewhere. And then there's a notice that's given when you are the insured and you're supposed to read your policies and you have a broker helping you. Now, when I look at the language in the federated policy, you could read it as giving the definition of earth movement as to be any earth movement such as earthquake, landslide, mine subsistence, earth sinking, rising, shifting. But sinkhole collapse is not part of that definition. And then we go to your policy. And could not the insured think that that definition in its policy, when you say earth movement, is the same as in the federated policy? No, Your Honor. The reasons I've given, the background of insurance here, is that catastrophe coverage is provided by the London insurers. And secondly, if you were an insured and you looked at the other than sinkhole collapse exception and you were looking and you actually read the three-page policy, you'd say, well, there's a sinkhole collapse exception. If we want more coverage, we should be asking for it. And, Your Honor, on the post, the issue of the post letter, the PUD has cited two cases, the Toulouse case and the Thayer cases. They're not dealing with media points on Washington law, but they are important on this very point that post-contract writings are helpful to the Court in displaying the understanding of the parties. And that's one of the reasons I referred to that letter from the broker at page 0445 of the record. You have two presumptions, I think, working against you. One is any ambiguity is in favor of the insured, and the other is the presumption that the excess coverage is simply excess coverage of exactly what was in the underlying policy. So you've got to overcome those presumptions. And do you think you've done that? We think we've done that. We think, first of all, on the first assumption, ambiguity is construed against the carrier. We don't think there's any ambiguity here. It's a clear, flat exclusion. And you're talking about the TIG policy. We're talking about it. That's what you look to. That's the policy that's an issue. If you look at that exclusion, there's no ambiguity. You only get to the idea of ambiguity if you sort of manufacture this ambiguity. And courts don't manufacture ambiguities. Well, apparently the district court did. And we're concerned. That's why we're here, Your Honor. So on the ambiguity. So let me get back to my original question. So your view is we just the federated policy just doesn't play any role in how you look at TIG's policy. No, we said it does play a role. But in the hierarchy of the policies, how they govern and how access insurance follow form policies work, priority is given to the three-page form agreement, which begins, except is provided elsewhere, then the terms and conditions, and then the federated coverage and other terms, which are not conflicting, would apply. So I think I've answered the first part of Judge Fletcher's question on ambiguity, that there was no ambiguity other than the one being manufactured by PUD. And the second one, the second question, dealing with a presumption about I don't know that that is a law, that there is a presumption. We have not been cited as a presumption that you interpret excess policies to incorporate the primary policy, even if there's an inconsistent term. In fact, the law in the five cases that we've cited on this point illustrates that there are that the general rule here is that the excess only follows to the extent it is not an exception. That's the practice of the industry, as reflected in the Osterager treatise. And there is available, but it wasn't obtained by PUD, a form of insurance known as broad as primary coverage, where the policy in the excess carrier says what you suggested. We are broad as a primary policy, notwithstanding any exclusions that we might have here. So PUD could have had that kind of policy, but it didn't. And it's trying to make out of the TIG policy, which had an exception, something that it didn't pay for, a broad as primary policy. I see I've got about four minutes left, Your Honor. If you have any questions, I'd like to save the rest for the bottle. Thank you very much, Your Honor. Good morning, Members of the Court. May it please the Court, Phil Talmadge here, representing the Public Utility District No. 1 of Cowlitz County. TIG asks this Court to ignore the context for the coverage that was placed here, the development of the language of the two policies federated in TIG.  It asks this Court to ignore the impact of the follow-up form provision about which the Court has asked questions. It asks this Court to ignore the standard of review with respect to motions for reconsideration. And it really asks this Court to ignore the principles of Washington law relating to the interpretation of insurance contracts. And when the Court applies these principles, the Court will conclude, we believe, that it should affirm Judge Layton's well-reasoned opinion that TIG, like the other three insurers who have already paid up their insurance responsibilities in this case, should be obliged to deal with the problem of the sinkhole coverage that took place here that led to the massive damage of the Public Utility District's SWIFT No. 2 facility and the interruption of electrical generation there. Let me note first, there was a question, I think, from Judge Fletcher with respect to how this issue came to be before Judge Layton, this question of the difference between the federated and the TIG policy. I think it's of interest to note, start first with the denial of coverage. This incident that we're talking about took place in April of 2002. Finally, in February of 2004, federated and TIG acting together denied coverage. I'd ask the Court to take a look at excerpts of record, pages 1392 to 99, to see if they ever raised the issue of whether or not the TIG excess policy provision about which we're speaking today is something upon which they could deny coverage. They didn't say anything analytically about that different provision whatsoever. They said it's simply a matter that's in addition to the federated policy. And they raised the issue we're talking about tangentially at best on the two rounds of motions for summary judgment in this case. In the first one, in 2004, this issue of TIG's policy was first raised briefly, and I say very briefly, in a reply on motion for summary judgment. That's found in excerpt of record pages 601 and 603 to 604. Then it was raised in a motion for clarification. But then in the subsequent motion for summary judgment in the early part of 2006, no mention whatsoever in the motion for summary judgment, no mention in argument to look at tab 16 of the excerpts of record of the argument before Judge Layton, no mention made of this at all. And finally, on reconsideration, the issue has now surfaced. In fact, if you look at the record, this is a circumstance where TIG and federated have been looking for every excuse that they can find to deny coverage in this case. They've looked at every single possibility from the DIC policies for Lloyds and Lexington, who paid up their responsibilities being primary, to the idea that sinkhole collapse was not the efficient proximate cause of this concern. So it's rather delicious irony that today they're arguing to the Court that this is a sinkhole collapse, and the Court should treat it accordingly when they deny that throughout the course of the case. The district court found it was sinkhole collapse. The district court found correctly that it was. And, in fact, there's a CM2HL, and I always get that, get through all the acronym there, but it's the report that was done almost immediately after the incident, and it reported that it was a sinkhole collapse. It's a large funnel. The water went down the funnel almost like going down a drain, and it was a sinkhole collapse that caused the loss of the hydroelectric facility here for the PUD. The trial court in this case, Judge Layton, understood that Washington law on the favors insureds. Judge Layton's a former past president of the Washington Defense Trial Lawyers Association. He understands about what he speaks when he says that. Washington law makes clear that we start with the intent of the parties, and you look at the context of the placement of the coverage as the place where you have to start in this case. And here I think it's vitally important to note that the public utility district about which we're speaking is located at the foot of Mount St. Helens. It's down in southwest Washington. There is a reason why the insurer and the insureds are all concerned about issues relating to things like volcanic eruptions and mud flows and earthquakes and things of that sort, because the mountain is there, and we only need to recall all those graphic pictures from 1980 of the mountain exploding and pyroclastic flows going down through river valleys to understand why an insurer would be concerned about this. Well, what does that have to do with coverage for a sinkhole? It's very important, Your Honor, because the CM2H Hill report notes that in 1959 and in 1972, this public utility district drained the canal about which we're speaking to repair sinkholes. So it understood that it had a sinkhole collapse potential problem that it needed to deal with, and it dealt with it. The language of the policies that were placed here, the language was written by Federated. The language was written by TIG. They had control of the pen in this case, and we note as well that the TIG access policy specifically referenced the underlying primary coverage of the Federated policy. So it was very explicitly laid out in the TIG access policy that that is the controlling policy. Are you saying that the Federated policy covered sinkhole collapse? Yes. Notwithstanding the endorsement? Yes. And that's, in fact, what Judge Layton ruled. I understand that. And we say that it isn't. It's the law of the case at this point. That's not something about which there's been any appeal. And, in fact, we note that Federated has settled up. They recognized when Judge Layton ruled the way he did that they had to pay their policy limits and did. The import of, I think, this context, Your Honor, is this, that in placing this insurance, TIG would have this Court conclude that the PUD, knowing it had a sinkhole collapse problem, twice having drained the canal at issue to repair sinkhole situations, agreed to limit its property coverage to merely $25 million when many more millions of dollars of assets were at stake. And the argument that, oh, the catastrophe policies covered this circumstance is an issue that has been raised and resolved in this case. They argued that the DIC policies were primary, and, in fact, the Federated and TIG policies both were access to them. Judge Layton rejected that, and they have not appealed that. That's the law of the case in this case. So we have that context issue. We next turn to the language of the policies involved, and the Court has been asking questions about that as well. The language of the policy is important because we have to look at how we construe that language. And Washington law gives a very significant set of glasses to the Court through which it has to look at this policy language. The Washington courts have instructed that you interpret the policy language not like a judge or a legal scholar, but like an average person buying insurance. And they've ruled that that's the principle even when you have as small a little airplane outfit as the Boeing company being the one that's dealing with the insurance coverage issue. Even for a corporate giant, that principle of the average person purchasing insurance applies. Looking at the language in this case, you look at it with those eyes in mind. You construe the language against the drafter, and TIG and Federated drafted the language that we're talking about. The burden of proof is on them to demonstrate that the exclusion applies. And the courts in Washington have said they will apply exclusions from policy coverage most strictly because in Washington the principle of insurance is to insure. Well, what does the exclusion, the TIG policy mean when it says excluding earth movement? We think it means essentially the same thing as the underlying Federated policy. They were both concerned about volcanic eruptions, pyroclastic flows, earthquakes that flowed from volcanic eruption. But in the case of the Federated policy, you have this interesting little parenthesis that's there in terms of the earth movement definition. And I would argue, I think Judge Fletcher raised this question in terms of that parenthesis, is it a separate definition? Arguably it is. It's a separate definition of what constitutes earth movement. Earth movement is all of the following things except that it is not a sinkhole collapse. Another way of looking at it is that the Federated policy had a distinct and separate peril that was insured, which was a sinkhole collapse. That's another way of looking at that very same policy provision. But in any event, what TIG does not want the court to do is to apply the principles of the follow-form provision in its policy. It has this special exclusion that excludes earth movement, just like the underlying Federated policy did. But the underlying Federated policy also defined earth movement in the way that it did, or alternatively had a separate peril for sinkhole collapse. And if either one of those two propositions is true, the TIG policy promised, in its follow-form provision, to follow the terms, conditions, and definitions of coverage. What do you say about the accept as provided clause? Well, I think the accept as provided clause is perfectly enforceable. But... What does it mean? It means accept as otherwise provided in the underlying policy. In the underlying policy, you have a separate and distinct definition that is to be followed. And in this particular case, they simply ignore that other definition. They ignore the fact that an average person purchasing insurance, Your Honor, looking at that policy, knowing that it had coverage under the Federated policy, that Federated has now conceded by paying up its policy limits, that average person purchasing insurance would now have to believe that the definition that was present in the underlying Federated policy was not something that followed form in the TIG policy when TIG had the pen and did not write a separate exclusion for a separate peril of sinkhole collapse or altered the definition of what constitutes earth movement to reflect the fact that it had, in the underlying policy, this separate definition. And it had the opportunity to do that. But you say there's a conflict between the TIG and the underlying policy. And the accept as provided clause should resolve that conflict. That is, TIG controls. I don't think so. And I don't think so for this reason. It doesn't address the issue of sinkhole collapse. It doesn't alter the definition. It doesn't have a definition that separately addresses sinkhole collapse. You have to break sinkhole collapse out of earth movement. The Federated policy did that. And the TIG policy follows form, including definitions. Except as provided. Except as provided. But it doesn't provide separately with respect to sinkhole collapse. The other part of the thing is, another way of looking at it, as I mentioned, is that it's a distinct peril. We have evidence in the TIG policy that TIG thought sinkhole collapse was a separate peril. It wrote an endorsement in its TIG policy for Y2K-related problems. And we're not arguing that the Y2K endorsement applies in these circumstances, but we only note that buried in that endorsement is a notion that there has to be an exclusion for sinkhole collapse from the provisions in the TIG policy. It seems to recognize the existence of a separate peril of sinkhole collapse because it has the separate endorsement that significantly and forcefully confronts that particular problem. The point here is we're not asking for something that's impossible in terms of an excess carrier looking at how it writes its policy coverages. This excess carrier, TIG, had in its policy a follow-form provision. It had a separate provision that said we are dealing with the Federated policy here. It was aware of the language in the Federated policy. It had control of the pen. And it could deal with this issue and should. And that's all that Judge Layton found in dealing with the issues in this case. The last thing I'd point out for the Court is that this is a case in which we've seen an insurer who has been dealing with these issues in a very interesting way over the entire course of the case. I think part of the context is to look at the fact that you have the two insurers  They send out a joint denial of coverage letter. They argue jointly with respect to a variety of issues. And this issue that we're talking about today, this latest reason for not providing coverage to the public utility district is really that, the latest reason for denying coverage to the PUD. The problem is the language of its own follow-form provision, the language of its own special exclusion does not address the issue of sinkhole collapse. And it needed to do that when the Federated policy did and when Federated provided coverage to the public utility district in this case. TIG has frankly delayed the payment of coverage in this case for now six years, casting it out for a reason. We simply ask the Court at this point, recognizing the fact that this was a sinkhole collapse that caused the loss, that the sinkhole collapse was addressed specifically in the Federated policy. The TIG excess policy followed that form, did not address specifically or in any way in a definitional section any view that the sinkhole collapse was not covered as the Federated policy did. That it should, as the other insurers have in this case, meet its responsibilities under its contract to pay the public utility district for the extraordinary loss that  And deal with that problem appropriately. We ask the Court to affirm Judge Layton's well-reasoned analysis in this issue and provide for attorney fees under the Olympic Steamship provision under Washington law dealing with insurance coverage in this case. If I can answer any of the questions for the panel. Thank you very much. I don't think so. Thank you very much. Several points, Your Honor. First, the reference in the except is provided elsewhere clause is not to the underlying policy. It's except is provided elsewhere in this agreement, with a capital A on agreement. With reference to the volcanic activity at Mount St. Helens, both the Federated policy and the TIG policy explicitly excluded volcanic activity, eruption, and so forth. The standard of review was raised here. The applicable standard of review on a summary judgment and an issue of insurance contract interpretation is de novo review of a question of law. But as we pointed out in our briefs, both the opening brief and the reply brief, if there's a question of law that's gotten wrong on a motion for reconsideration, that is reviewed as a question of law. And even if the abusive discretion test applies, which we urge is not applicable, but even if that test applied under the Ninth Circuit cases when the judge gets it wrong on the fundamental ruling of law, that's an abuse of discretion. So under any applicable standard of review, and particularly the one that we're talking about, the judge got it wrong. Now, with respect to the Y2K argument, that refers, that's a form endorsement. It refers to a number of policies. The district judge rejected the point that is being made by the, by PUD. And that Y2K provision only applies if the, as it explicitly says, if there would be coverage under those policies. Now, with regard to the judge having experience in Washington law and his credentials and so forth, he was, as I say, a conscientious judge wanting to issue, reach this issue directly. He rejected the Y2K. He rejected the estoppel points. He hit it squarely. He just got it wrong. And in deference, when you apply the, when you apply the de novo standard of review issue, you can take into account the district judge, but his experience. But this is a legal question. This is before you as a question of law. And if the district judge didn't get it right, then he should be reversed. And reversed, as we suggest, with directions at the interjudgment for, for TIG. There is a separate definition of earth movement. As I say, the priorities of the policies here, you go to the TIG policy, the first thing, that's the priority document, the three-page document. Accept is provided elsewhere in this agreement, and then you turn down to special exclusion, and there it's provided. An absolute, flat, broad exclusion for any earth movement. So there was no occasion here for TIG to have to take its pen after the fact or before the fact and put in some words like sinkhole collapse. And lastly, with regard to the joint representation, both companies here thought that the separate collapse exclusion in the endorsement to the federated policy, to which the excess would have followed form, both of them thought that that collapse section is controlled. It's understandable that they rejected coverage. The district judge ruled against them on that. It's a matter of law. We've elected not to appeal that. That doesn't mean we're conceding it or that we're wrongdoing or something in that. It's just that we've elected to concentrate on what we think is the dispositive legal issue on this appeal, a flat exclusion for earth movement, and we suggest that the district judge and his judgment be reversed with directions to grant summary judgment for TIG Insurance Company. Thank you very much, Your Honors. Thank you. We appreciate your arguments on both sides. And the matter will be submitted. Thank you.
judges: Fletcher, Paez, Schwarzer